UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARY SUE GJOKAJ,

    Plaintiff(s),

v.

CROSSMARK, INC.,

    Defendant(s).
_____/

Case No. 07-11813

Honorable Nancy G. Edmunds

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [23]**

Plaintiff Mary Sue Gjokaj filed this action against Defendant Crossmark, Inc., and asserts two claims: 1) that Defendant fired her in violation of the Michigan Elliot-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2701; and 2) that Defendant violated Michigan's public policy against witness intimidation, threat, or coercion. Defendant counters that Plaintiff never engaged in protected activity and therefore is not protected by the Michigan Elliot-Larsen Civil Rights Act and that, in any event, Defendant had a legitimate business reason to fire Plaintiff. Defendant also asserts that it did not contravene public policy when it fired Plaintiff. This matter comes before the Court on Defendant's motion for summary judgment. For the reasons set forth below, Defendant's motion is GRANTED.

**I.    Facts**

Defendant is a sales and marketing agency that provides services to manufacturers and retailers to induce shoppers to buy at the point of purchase. (Def.'s Mot. at 3.) Plaintiff began to work for Defendant's corporate predecessor in 1991. (Pl.'s Resp. at 2.) She

progressed through various positions in the 1990's and was the office manager when Defendant acquired her employer in 2000. (*Id.*)

The parties dispute whether Plaintiff also served as a Human Resource Coordinator ("HRC"). Defendant states that she filled that position from 2000 to October 2006. (Def.'s Mot. at 3.) Plaintiff concedes that she was the HR contact person for the Detroit office between April 2001 and August 2003, but argues that she worked only as an office manager from August 2003 to October 2006. (Pl.'s Resp. at 3.) Plaintiff testified in her deposition, however, that she held the position of HRC through 2006.[1] (Def.'s Mot., Ex. 1 at 55-56.) She also testified that, as HRC, she was supposed to maintain communication with corporate HR regarding local issues or concerns, work with Defendant's employees on HR-related matters, and work with corporate HR with respect to disciplinary actions. (*Id.* at 56-57.) She further conceded that she "was to direct all human resource issues to the Human Resource Corporate Center in Plano." (Pl.'s Resp., Ex. 3 at ¶ 21.)

She also participated in HRC conference calls that occurred on a monthly basis from 2004 to 2006. (Def.'s Mot., Ex. 1 at 52.) Before each call, employees would receive an agenda that set forth what would be covered in the call. (*Id.* at 54.) The minutes from the June 16, 2004 HR conference call reflect that the employees were told that "all lawsuit concerns should be communicated to Corporate HR." (Def.'s Mot., Ex. 10A at 3.) The minutes from the July 18, 2006 call establish that the employees were told whom to contact if they had questions about their responsibility to make sure Defendant's policies and

---

[1] Nonetheless, Plaintiff submitted an affidavit in which she states, "I had no human resource responsibilities during the last three years of my employment." Pl.'s Resp., Ex. 3 at ¶ 17.)

procedures were followed. (Def.'s Mot., Ex. 10C at 1.) Although Plaintiff continued to sit in on the conference calls through 2006, she does not recall participating in calls that discussed how to address or investigate employee complaints. (Def.'s Mot., Ex. 1 at 53-54, 106-07.)

Plaintiff received Defendant's "Full-time Associate Policy Manual" and acknowledged that she understood and would comply with Defendant's "policies and work rules as a condition of [her] employment." (Def.'s Mot., Ex. 1A.) The manual states that a violation of the rules of conduct will result in "disciplinary action up to and including termination." (Def.'s Mot., Ex. 9A at 39.) The manual's discussion of sexual harassment includes the following provision:

> Any associate, supervisor, or manager who becomes aware of any such objectionable conduct by an associate, supervisor, manager or business associate has the responsibility to advise the Manager in Charge, Human Resources Coordinator or Human Resource Services directly. . . . The incident will then be reported to Human Resource Services at the Corporate Service Center.

*Id.* at 41.

Defendants "General Safety Policy" and "Physical Security Policy" both state that "associates within the office are responsible for reporting any safety and security issues or concerns to the SSM [Safety and Security Manager] or MIC [Manager in Charge] immediately." (Def.'s Mot., Ex. 9B at ¶ 3.4.1; Ex. 9C at ¶ 3.4.1.) The General Safety Policy notes that "associates can help [to prevent violence in the workplace] by reporting what they see in the workplace that could indicate that a co-worker is trouble." (Def.'s Mot., Ex. 9B at ¶ 5.3.3.) The "Physical Security Policy" requires "associates who . . . hear of physical

3

threats made against associates of the Company or others [to] immediately contact the MIC or SSM." (Def.'s Mot., Ex. 9C at ¶ 5.4.)

On September 1, 2006, Plaintiff was approached by a fellow employee, Karen Anson, who stated that she was receiving harassing and threatening letters at work. (Pl.'s Resp. at 4.) Ms. Anson had been having an affair with a co-worker, John Lindquist, and believed the letters were from Mr. Lindquist's wife. (Def.'s Mot. at 6; Pl.'s Resp. at 4.) Ms. Anson showed Plaintiff one of the letters. (*Id.*) Plaintiff testified that upon seeing the letter's content, she informed her boss, Greg Earhart, of the situation. (Pl.'s Resp., Ex. 3 at ¶ 26B.) She does not recall if she characterized the letter as threatening. (*Id.*) For his part, Mr. Earhart denies that Plaintiff informed him that an employee was receiving harassing or threatening letters at the office.[2] (Def.'s Mot., Ex. 8 at ¶ 8.)

There is no record of the letter that Ms. Anson showed to Plaintiff on September 1, 2006. (Pl.'s Resp. at 5.) Defendant has produced subsequent letters received by Ms. Anson. (Def.'s Mot., Exs. 1B, 1C.) Plaintiff characterizes these letters as "extremely more threatening" than the September 1 letter and notes that they were received after September 12, 2006. (Pl.'s Resp., Ex. 3 at ¶ 27.)

---

[2]Contrary to Plaintiff's assertion, Lisa Austin, Defendant's Director of Employee Relations, did not testify that Plaintiff "behaved appropriately to company protocol to notify your manager of issues." (Pl.'s Resp. at 4.) Rather, Ms. Austin stated that such a step "would be one of the steps that could be taken, *if* it was taken." (Pl.'s Resp., Ex. 9 at 122.) (emphasis added) Indeed, Ms. Austin had contacted Mr. Earhart, and he told her that he had "no knowledge that any employee in the Detroit office was receiving threatening letters." (Def.'s Mot., Ex. 7 at ¶ 8.)

4

During the week of September 4, 2006, Plaintiff learned that Ms. Anson was seeking a Personal Protection Order ("PPO") against Mrs. Lindquist.[3] (Def.'s Mot. at 7; Pl.'s Resp. at 4.) Plaintiff claims that Ms. Anson told her that a detective requested her presence at the hearing in case she needed to testify that Ms. Anson had received the threatening letters through the mail. (Pl.'s Resp. at 4.) Plaintiff did not inform anyone employed by Defendant about the hearing until after it occurred. (Def.'s Mot., Ex. 1 at 122-23.)

Plaintiff attended the PPO hearing, which took place on September 12, 2006. (Def.'s Mot. at 7; Pl.'s Resp. at 5.) Plaintiff claims that she did not attend the hearing as an official representative of Defendant. (Def.'s Mot., Ex. 1 at 131.) Despite this assertion, when the judge at the PPO hearing asked Ms. Anson if her employer knew about the affair, Ms. Anson replied, "I have one with me today. I have our HR Coordinator." (Def.'s Mot., Ex. 13 at 13.) Nonetheless, Plaintiff did not testify at the hearing. (Def.'s Mot., Ex. 1 at 130.) Ms. Anson's request for a PPO was denied. (Def.'s Mot., Ex. 13 at 14-15.)

Later that day, Plaintiff reported the situation, including the PPO hearing, to Tom Waller, the manager in charge of Defendant's Detroit office. (Def.'s Mot., Ex 12 at ¶ 4, 10; Pl.'s Resp., Ex. 3 at ¶ 26H.) This was the first Mr. Waller had heard of the situation. (Def.'s Mot., Ex. 12 at ¶13.) Plaintiff states that after she spoke to Mr. Waller, she called corporate HR in Plano of her own accord.[4] (Pl.'s Resp., Ex. 3 at ¶ 26I.) She states that she asked for Rodger Fisher (Defendant's vice president of HR), was given to Cindy Slinker (an

---

[3]Plaintiff incorrectly asserts that Ms. Anson sought a PPO against Mr. Lindquist (Pl.'s Resp. at 2) and against "Mr. Lindquist and his wife" (Pl.'s Resp. at 5). The record is clear that Ms. Anson sought a PPO only against Mrs. Lindquist. *See* Def.'s Mot., Ex. 13.

[4]Mr. Waller maintains that he instructed Plaintiff to contact corporate HR. (Def.'s Mot., Ex. 12 at ¶ 12.)

5

HR generalist), and was told that Ms. Austin would return her call later in the day. (*Id.*; Def.'s Mot., Ex. 9 at ¶ 2; Ex. 11 at ¶ 2.)

Ms. Slinker, on the other hand, swore in an affidavit that she heard of the situation for the first time when Mr. Lindquist called the day of the PPO hearing. (Def.'s Mot., Ex. 11 at ¶ 6.) Mr. Lindquist explained the situation and expressed concern that Defendant was taking Ms. Anson's side in the dispute because he believed that Plaintiff attended the hearing in her official capacity as an HR coordinator. (*Id.* at ¶ 4.) Ms. Slinker contacted Ms. Austin to inform her of the situation. (*Id.* at ¶ 5.)

Ms. Austin states that the call from Ms. Slinker was first she heard of the situation. (Def.'s Mot., Ex. 7 at ¶ 5.) Ms. Austin and Ms. Slinker began an investigation into the circumstances surrounding the threatening letters and the PPO hearing. (*Id.* at ¶ 6.) They called Plaintiff that day to discuss the situation. (*Id.* at ¶ 7.) Ms. Austin told Plaintiff that the letters created a potential serious safety risk and should have been reported to corporate HR immediately. (*Id.*) She also told Plaintiff that she is not permitted to attend court proceedings on behalf of any of Defendant's employees without first contacting corporate HR or the legal department. (*Id.*) She asked Plaintiff to notify her if Ms. Anson received any more letters. (Def.'s Mot., Ex. 1 at 114.)

Ms. Anson received another letter on September 14, 2006. (Pl.'s Resp. at 5; Def.'s Mot., Ex. 1B.) Plaintiff immediately faxed the letter to Ms. Austin. (*Id.*) The letter read:

> Karen,
>
> Did you really think you stood a chance in court? I told you before that I know people in high places. Sinners like you never win. You will be taken care of very soon and no one will be able to help you not even the police. Watch your back and every step you take as they will be your final ones.

SINNER

(Def.'s Mot., Ex. 1B.)

As part of her investigation, Ms. Austin spoke with Mr. Earhart (Plaintiff's boss) and Mr. Waller (the manager in charge of Defendant's Detroit office). (Def.'s Mot., Ex. 7 at ¶ 8, 9.) She then met with Mr. Fisher (Defendant's vice president of human resources), Johnette Oden-Brunson (Defendant's vice president and general counsel), and David Baxley (Defendant's chief executive officer). (*Id.* at ¶ 13; Def.'s Mot., Ex. 10 at ¶ 2.) The group "reached a consensus that [Plaintiff] should be terminated due to a loss of confidence in her ability to perform her job as Office Manager/HR Coordinator." (Def.'s Mot., Ex. 7 at ¶ 14.) Their loss in confidence was attributed to Plaintiff's allegedly poor judgment when she: 1) failed to report the affair between Ms. Anson and Mr. Lindquist, 2) failed to report "a potentially serious safety threat" to corporate HR or to her managers, and 3) attended the PPO hearing without informing Defendant. (*Id.*)

Plaintiff was fired on October 13, 2006, during a meeting with Ms. Austin and Mr. Waller. (Pl.'s Resp. at 5.) Plaintiff claims that Mr. Waller told her she was fired because she had "gone to court." (*Id.*) The "Exit Interview Form," which was signed by Plaintiff, lists the reason for her termination as "loss of confidence." (Pl.'s Resp., Ex. 11.)

Ms. Anson never filed any internal complaints with Defendant about sexual harassment or any other kind of discrimination. (Def.'s Mot. at 5.) She never filed a charge of discrimination or harassment with the EEOC or with the Michigan Department of Civil Rights. (*Id.*) She also never filed a lawsuit against Defendant. (*Id.*)

Plaintiff filed this action on April 25, 2007.[5] (*Id.* at 9.) This matter is now before the Court on Defendant's motion for summary judgment.

## II. Summary Judgment Standard

Summary judgment is appropriate only when there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The non-moving party may not rest upon its mere allegations, however, but rather "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The mere existence of a scintilla of evidence in support of the non-moving party's position

---

[5]She did not file a charge of discrimination or retaliation with the EEOC, the Michigan Department of Civil Rights, or any other state or federal agency with respect to her termination. (Def.'s Mot. at 9.)

will not suffice. Rather, there must be evidence on which the jury could reasonably find for the non-moving party. *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 432 (6th Cir. 2002).

## III. Analysis

Plaintiff asserts two causes of action against Defendant: she claims that Defendant violated the Michigan Elliot-Larsen Civil Rights Act and Michigan's public policy against witness intimidation, threat, or coercion. The Court recognizes that several issues of fact exist in this case. These issues are not material, however, as the Court's disposition of the case would be the same under any factual scenario put forward by either party. The Court will address Plaintiff's claims in turn.

### A. Michigan Elliot-Larsen Civil Rights Act

The Michigan Elliot-Larsen Civil Rights Act ("MELCRA") prohibits retaliatory conduct or discrimination by an employer in two situations: 1) when an employee "has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act," or 2) when an employee "has opposed a violation of this act." Mich. Comp. Laws § 37.2701(a). To establish a prima facie case of retaliation, Plaintiff must show: 1) she opposed a violation of MELCRA or participated in activities protected by MELCRA, and 2) that the opposition or participation was a significant factor in an adverse employment decision. *Booker v. Brown & Williamson Tobacco Co., Inc.*, 879 F.2d 1304, 1310 (6th Cir. 1989).

Plaintiff's claim is premised entirely upon the "participation clause."[6] The protection granted by this clause is "exceptionally broad" and extends to persons who have "participated in any manner" in MELCRA proceedings. *Id.* at 1312. "[O]nce the activity in question is found to be within the scope of the participation clause, the employee is generally protected from retaliation." (*Id.*)

Defendant cites *Booker* for the proposition that "the instigation of proceedings leading to the filing of a complaint or charge . . . is a prerequisite to protection under the participation clause." *Booker*, 879 F.2d at 1313. This approach was expressly rejected by the Michigan Court of Appeals in *McLemore v. Detroit Receiving Hospital & University Medical Center*, 493 N.W.2d 441, 443 (Mich. Ct. App. 1993). The *McLemore* court held that, "[r]egardless of the vagueness of the charge or the lack of formal invocation of the protection of the act, if an employer's decision to terminate or otherwise adversely effect [sic] an employee is a result of that employee raising the specter of a discrimination complaint, retaliation prohibited by the act occurs." *Id.* Defendant suggests that the Court should ignore *McLemore* because it expressly rejects *Booker*. (Def.'s Reply at 3 n.1.) Defendant's suggestion is contrary to Sixth Circuit precedent, which holds that "this court is bound by decisions of the state's intermediate appellate courts unless convinced that the Michigan Supreme Court would decide the question differently." *United of Omaha Life Ins. Co. v. Rex Roto Corp.*, 126 F.3d 785, 789 (6th Cir. 1997). Given that *McLemore* expressly

---

[6]Plaintiff's complaint states that she "opposed a violation of the Michigan ELCRA in her assistance and participation in a subordinate employee's judicial complaint of sexual harassment." (Compl. at ¶ 11.) Thus, the only way Plaintiff "opposed" a violation of MELCRA was to participate in the PPO hearing. Because MELCRA distinguishes between opposition and participation, Plaintiff has presented a claim under the "participation clause" only.

rejected the Sixth Circuit's interpretation of Michigan law, and given that the Michigan Supreme Court declined to hear an appeal in the case, 506 N.W.2d 877 (1993), this Court is not convinced that the Michigan Supreme Court would decide the question differently than did the *McLemore* court. Accordingly, the Court will use the *McLemore* standard to assess Plaintiff's claim under the "participation clause."[7]

Plaintiff's MELCRA claim is premised on her attendance at Ms. Anson's PPO hearing. MELCRA prohibits retaliation against a person who has "participated in an investigation, proceeding, or hearing *under this act*." Mich. Comp. Laws § 37.2701(a) (emphasis added). A threshold question, then, is whether the PPO hearing constituted a hearing under MELCRA.

In order to make her claim cognizable under MELCRA, Plaintiff has tried to cast the letters received by Ms. Anson and the subsequent PPO hearing as matters of sexual harassment. (Pl.'s Resp. at 11.) MELCRA prohibits discrimination on the basis of sex and provides that "[d]iscrimination because of sex includes sexual harassment." Mich. Comp. Laws § 37.2103(i). The statute defines sexual harassment:

> Sexual harassment means unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature under the following conditions:
>
> (i) Submission to the conduct or communication is made a term or condition either explicitly or implicitly to obtain employment, public accommodations or public services, education, or housing.

---

[7]This Court recently applied the *Booker* standard in *E.E.O.C. v. Kidney Replacement Services*, No. 06-13351, 2007 WL 1218770, *4 (E.D. Mich. 2007). The plaintiff's claims in that case were brought pursuant to federal law. Accordingly, it was appropriate to use federal precedent to analyze those claims. Here, because Plaintiff's claims are brought pursuant to Michigan law, *McLemore* is controlling.

11

> (ii) Submission to or rejection of the conduct or communication by an individual is used as a factor in decisions affecting the individual's employment, public accommodations or public services, education, or housing.
>
> (iii) The conduct or communication has the purpose or effect of substantially interfering with an individual's employment, public accommodations or public services, education, or housing, or creating an intimidating, hostile, or offensive employment, public accommodations, public services, educational, or housing environment.

*Id.*

Plaintiff's attempt to portray the letters and PPO hearing as issues of sexual harassment under MELCRA fails in several respects. First, Plaintiff has not produced any evidence that Ms. Anson raised even "the specter of a discrimination complaint." *McLemore*, 493 N.W.2d at 443. To constitute sexual harassment under MELCRA, the letters received by Ms. Anson would have to be "of a sexual nature." There is no evidence before the Court that the letters were sexual in any way. At the PPO hearing, Ms. Anson addressed only the threatening nature of the letters and did not suggest that they contained any sexual content. *See* Def.'s Mot., Ex. 13 at 5. Accordingly, the letters did not constitute sexual harassment for purposes of MELCRA.

Equally unavailing is Plaintiff's reliance on two cases to suggest that the "affair gone bad . . . became a matter of sexual harassment when Ms. Anson allegedly began receiving harassing notes."[8] (Pl.'s Resp. at 11.) In *Pergine v. Penmark Management Co.*, 314 F. Supp. 2d 486 (E.D. Pa. 2004), the plaintiff entered into a consensual sexual relationship with her supervisor at work. *Id.* at 491. After she ended the relationship, her supervisor

---

[8] Plaintiff suggests that the notes were "caused by Mr. Lindquist," (Pl.'s Resp. at 11), but has offered no evidence to support this assertion.

told her that "if there wasn't going to be a sexual relationship, there wasn't going to be a job." *Id.* at 492. The court held that a "relationship that is consensual at its inception does not necessarily preclude a [sexual harassment] claim by an employee, if the employee later attempts to break off the relationship, and suffers an adverse employment action as a result." *Id.* at 491.

Similarly, in *Perks v. Town of Huntington*, 251 F. Supp. 2d 1143 (E.D.N.Y. 2003), after the plaintiff ended a sexual relationship with his supervisor, the supervisor took "adverse employment actions against him" and "created an environment that was sufficiently abusive and hostile to be actionable" as sexual harassment. *Id.* at 1155. The court concluded that "employees who are themselves the victims of sexual harassment" are not precluded from invoking statutory "protections merely because of their previous relationship with the harasser." *Id.* at 1156.

The takeaway from these cases, then, is that a previously consensual relationship with a supervisor does not preclude a subsequent claim for sexual harassment. These cases are not applicable to the case before the Court, however, as they are factually distinguishable in key respects. Unlike the plaintiffs in *Pergine* and *Perks*, Ms. Anson, after she ended the affair with Mr. Lindquist, was not subjected to conduct that constitutes sexual harassment under MELCRA.[9] The fact that she received threatening letters allegedly written by Mr. Lindquist's wife is not tantamount to the types of adverse employment actions suffered by the *Pergine* and *Perks* plaintiffs. Accordingly, the cases

---

[9]The Court is puzzled by and rejects Plaintiff's argument that Ms. Anson's receipt of harassing letters constituted an "adverse employment action." (Pl.'s Resp. at 12.)

13

are not on point and do not transform Ms. Anson's PPO hearing into a sexual harassment hearing brought under MELCRA.

Finally, the Court rejects Plaintiff's argument that "Defendant is effectively estopped from saying the PPO hearing was anything other than" a sexual harassment hearing because Mr. Fisher stated that Plaintiff's "failure to report the harassing and threatening letters and the existence of a PPO hearing to Corporate HR was a clear violation of the express terms of [Defendant]'s policies and procedures for reporting harassment and safety concerns." (Pl.'s Resp. at 14; Def.'s Mot., Ex. 9 at ¶ 16.) First of all, even if Plaintiff violated Defendant's internal policies, that does not mean that Plaintiff also violated MELCRA. Moreover, Defendant's Policy Manual distinguishes harassment from sexual harassment. *See* Def.'s Mot., Ex. 9A at 40. And while Mr. Fisher stated that Plaintiff violated policy with respect to harassment, he never suggested that Plaintiff's conduct implicated the sexual harassment policy in any way. Accordingly, Mr. Fisher's statements do not substantiate Plaintiff's claim that this was an issue of sexual harassment.

Because Plaintiff did not participate in a hearing pursuant to MELCRA, she cannot invoke its protections as the basis of a retaliation claim against Defendant. As a result, Defendant's motion for summary judgment is GRANTED with respect to Plaintiff's MELCRA claim.

**B. Michigan Public Policy**

Plaintiff's second claim is that Defendant violated Michigan's public policy against witness intimidation, threat, or coercion. Ordinarily, an employment contract for an indefinite term is terminable at will. *See, e.g., Suchodolski v. Mich. Consol. Gas Co.*, 316 N.W.2d 710, 711 (Mich. 1982). The Michigan Supreme Court in *Suchodolski* recognized

an exception to this rule "based on the principle that some grounds for discharging an employee are so contrary to public policy as to be actionable." *Id.* The *Suchodolski* court set forth three situations in which such a cause of action is permitted; the one relevant to this case provides for a cause of action "when the reason for a discharge was the employee's exercise of a right conferred by a well-established legislative enactment." *Id.* at 712. "[A] claim of discharge in violation of public policy is an extremely narrow and rarely recognized cause of action." *DiTomaso v. Elec. Data Sys.*, No. 87-60320, 1988 WL 156317, *4 (E.D. Mich. Oct. 7, 1988). Additionally, "Michigan law requires the location of some legislative enactment to ground a finding that a discharge is in breach of public policy." *Pratt v. Brown Mach. Co.*, 855 F.2d 1225, 1236 (6th Cir. 1988).

Plaintiff claims that her termination violated the rights conferred to her by Mich. Comp. Laws § 750.122, which prohibits witness tampering. (Def.'s Mot., Ex. 1D at ¶ 9.) The portions of the statute relevant to Plaintiff's claim are as follows:

> (1) A person shall not give, offer to give, or promise anything of value to an individual for any of the following purposes:
>
> > (a) To discourage any individual from attending a present or future official proceeding as a witness, testifying at a present or future official proceeding, or giving information at a present or future official proceeding. . . .
>
> (3) A person shall not do any of the following by threat or intimidation:
>
> > (a) Discourage or attempt to discourage any individual from attending a present or future official proceeding as a witness, testifying at a present or future official proceeding, or giving information at a present or future official proceeding. . . .
>
> (6) A person shall not willfully impede, interfere with, prevent, or obstruct or attempt to willfully impede, interfere with, prevent, or obstruct the ability of a

15

witness to attend, testify, or provide information in or for a present or future official proceeding. . . .

(8) A person who retaliates, attempts to retaliate, or threatens to retaliate against another person for having been a witness in an official proceeding is guilty of a felony punishable by imprisonment for not more than 10 years or a fine of not more than $20,000.00, or both. As used in this subsection, "retaliate" means to do any of the following:

> (a) Commit or attempt to commit a crime against any person.
>
> (b) Threaten to kill or injure any person or threaten to cause property damage.

(9) This section applies regardless of whether an official proceeding actually takes place or is pending or whether the individual has been subpoenaed or otherwise ordered to appear at the official proceeding if the person knows or has reason to know the other person could be a witness at any official proceeding.

Mich. Comp. Laws § 750.122(1)(a), (3)(a), (6), (8), (9).

To prevail on her public policy claim, Plaintiff need not prove a violation of the statute itself. *See Pratt*, 855 F.2d at 1237. It is necessary, however, for the Court to look to the text of the statute to determine whether the statute may serve "as the legislative foundation upon which a cause of action of this nature could be implied." *Id.; see also Psaila v. Shiloh Industries, Inc.*, 671 N.W.2d 563, 566 (Mich. Ct. App. 2003) (analyzing statutory text to discern underlying public policy).

The Michigan Court of Appeals recently analyzed § 750.122 in *People v. Greene*, 661 N.W.2d 616 (Mich. Ct. App. 2003). Although the court focused on subsection (6), it sought to "understand[] the statute as a whole." *Id.* at 622. The court concluded that "[t]he unifying theme among these subsections is an attempt to identify and criminalize the many ways individuals can prevent or attempt to prevent a witness from appearing and providing

16

truthful information in some sort of official proceeding." *Id.* at 624. The court also recognized, however, that the statute identified "four different categories of witness tampering: bribery (subsection 1), threats or intimidation (subsection 3), interference (subsection 6), and retaliation (subsection 8)." *Id.* Because the different types of tampering are broken out in the statute, the *Greene* court determined that "the Legislature considered them to be distinct." *Id.* In accordance with this determination, this Court will assess the public policy that is represented by each subsection.

Subsections (1), (3), and (6) by their own terms apply only to actions taken with respect to an individual who may participate in "a present or future official proceeding." And while subsection (9) clarifies that the statute "applies regardless of whether an official proceeding actually takes place or is pending," it also limits the statute's applicability to those who "know or [have] reason to know the other person could be a witness at any official proceeding." Based on this, the Court determines that the public policy evidenced by subsections (1), (3), and (6) is limited to situations where a specific proceeding is either underway or is at least contemplated. To conclude otherwise, as Plaintiff suggests the Court should do,[10] would extend the statute's scope beyond all reasonable limits, as an individual could invoke the statute's protections on the mere speculation that she might someday, somewhere be involved in an official proceeding.[11]

---

[10] Plaintiff suggests that the statute illustrates a public policy that protects any employee who wishes "to go to court." (Pl.'s Resp. at 10.)

[11] The Court's refusal to infer an extremely broad public policy that is not suggested by the statutory text is in keeping with decisions of the Michigan courts. *See, e.g.*, *Psaila*, 671 N.W.2d at 566 (rejecting plaintiff's public policy claim for wrongful discharge because "nothing in the statute prohibits an employer from terminating a sales representative"); *Goichai v. Lender Ltd.*, No. 262823, 2005 WL 3238496, *2 (Mich. Ct. App. Dec. 1, 2005)

The cases cited by Plaintiff in which courts applied the *Suchodolski* public policy exception are not on point as they involved different statutory provisions than those at issue here. *See Wiskotoni v. Mich. Nat'l Bank-West*, 716 F.2d 378, 383 (6th Cir. 1983) (discussing Michigan laws that establish and protect the grand jury system); *Smetts v. Whiteford Sys., Inc.*, No. K88-320CA8, 1990 WL 299250, *6 (W.D. Mich. Apr. 11, 1990) (assessing Michigan law regarding jury service). Moreover, the employer in each case knew that the employee planned to participate in a future proceeding and took action to prevent it. *See Wiskotoni*, 716 F.2d at 383 (employee was fired after he was subpoenaed to appear and testify before a grand jury); *Smetts*, 1990 WL 299250 at *5 (employee was fired after he informed his employer that he had jury duty). Here, in contrast, Defendant did not learn of the PPO until after it already had occurred.

Plaintiff has produced no evidence to suggest the existence of another potential proceeding about which Defendant knew our should have known; indeed, neither party has suggested that another proceeding ever actually occurred. And the Court rejects Plaintiff's contention that the public policy encompassed by subsections (1), (3), and (6) is implicated because Defendant could not be sure that "no further proceeding would result as a consequence of the Anson/Lindquist affair." (Pl.'s Resp. at 17 n.6.) Thus, because the PPO hearing already had occurred when Plaintiff was fired, and because no other foreseeable proceeding was on the horizon, the public policy represented by subsections (1), (3), and (6) was not implicated by Plaintiff's termination.

---

(rejecting Plaintiff's public policy argument that federal law that immunized lenders who maintained certain procedures constituted Congressional authorization to lenders' employees to report violations).

The sole remaining provision upon which Plaintiff's public policy claim rests is subsection (8), which prohibits retaliation "against another person for having been a witness in an official proceeding." As the text makes clear, this provision was only intended to protect those who have actually testified, which Plaintiff admittedly did not. Moreover, the subsection's reach is limited to retaliation that takes the form of criminal action or threats of physical violence toward another. Plaintiff has made no allegation that Defendant engaged in such conduct. Accordingly, Plaintiff's claim cannot be maintained under the public policy established in subsection (6).

Based on the foregoing, Plaintiff has failed to establish that her discharge was "so contrary to public policy as to be actionable." *Suchodolski*, 316 N.W.2d at 711. Defendant's motion for summary judgment with respect to Plaintiff's public policy claim is therefore GRANTED.

## IV. Conclusion

For the above-stated reasons, Defendant's motion for summary judgment is GRANTED in its entirety.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated: April 10, 2008

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on April 10, 2008, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager